**Spencer ABRAHAM, Secretary of Energy, Appellant,**

v.

**ROCKWELL INTERNATIONAL CORPORATION, Appellee.**

No. 02–1277.

United States Court of Appeals, Federal Circuit.

April 16, 2003.

John A. Kolar, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for appellant. With him on the brief were Robert D. McCallum, Jr., Acting Associate Attorney General; David M. Cohen, Director; and Mark A. Melnick, Assistant Director. Of counsel on the brief was Marc Johnston, Attorney, Office of General Counsel, Department of Energy, of Washington, DC.

Richard J. Ney, Chadbourne & Parke LLP, of Los Angeles, CA, argued for appellee. Of counsel were Scott James Preston; and William J. Kelly, III, Kelly & Kelly, of Irvine, CA.

Before NEWMAN, RADER and DYK, Circuit Judges.

DYK, Circuit Judge.

The Secretary of Energy appeals the decision of the Department of Energy Board of Contract Appeals ("Board") in favor of Rockwell International Corp. ("Rockwell"). *Rockwell Int'l Corp.*, Nos. C–9509187, C–9509220, & C–95099221, 2001 WL 1543836, 2001 EBCA LEXIS 7, at *1 (EBCA Oct. 31, 2001).

This case presents the question whether legal fees and other costs incurred in a successful defense against environmental criminal charges are recoverable under Rockwell's contract with the Department of Energy ("DOE"). We hold that the costs are recoverable and affirm the decision of the Board, though on narrower grounds than those adopted by the Board.

## BACKGROUND

Rockwell International Corp. ("Rockwell") managed and operated the Rocky Flats Nuclear Weapons Plant ("Rocky Flats") in Colorado under cost-reimbursement Management and Operation (M & O) contract DE–AC04–76DP03533 with the Department of Energy ("the Department" or "DOE") from June 30, 1975, to December 31, 1989. Rockwell and the Department agreed to modifications of the terms of the M & O contract during this period. At issue here are two modifications: modification M087, which covered performance from January 1, 1986, through December

31, 1988; and modification M124, which covered performance from January 1, 1989, through December 31, 1989.[1]

Rocky Flats was a Government-owned facility for producing components for nuclear weapons. Since the construction of the plant in the early 1950s, private industrial firms provided the management and operation of the facility, pursuant to M & O contracts. Because of the inherent danger in manufacturing nuclear weapons components, the contracts required the government to assume "virtually all operational and financial risks" in performing the contracts. *Rockwell,* 2001 EBCA LEXIS 7, at *4. Rockwell's contracts were structured as cost reimbursement contracts, which permitted Rockwell to recover all allowable costs that were allocable to the contracts. The dispute here centers on the allowability of certain costs incurred by Rockwell.

The specific costs for which Rockwell seeks reimbursement are: attorneys' fees and costs ($1,157,364) incurred between June 6, 1989, and December 31, 1989, defending itself against possible criminal environmental charges by the federal government; attorneys' fees and costs ($3,725,461) incurred defending individual employees against possible government criminal environmental charges; and the cost ($5,156,686) of a computerized litigation database used in defense against the potential charges and for other purposes.

A criminal investigation was initially undertaken by the Federal Bureau of Investigation, the Environmental Protection Agency ("EPA"), and the United States Attorney's Office alleging criminal environmental practices at Rocky Flats. Rockwell's first formal notice of the investigation came through service of a search

warrant on June 6, 1989, seeking evidence of environmental crimes. The affidavit in support of the warrant included a long list of alleged criminal violations by both Rockwell and its employees. These allegations never ripened into formal criminal charges against either Rockwell or its employees.

Rockwell retained legal counsel both for itself and for individual employees to defend against the allegations. Additionally, Rockwell developed a computerized database ("the database"), which was used in the criminal investigation and related civil actions as well as for other purposes, including "civil litigation and in carrying out day-to-day administrative projects and tasks." *Id.* at *35. The database was used to organize, track, search, and retrieve hundreds of thousands of pages of documents.

During 1990 the government made additional allegations of criminal conduct beyond those listed in the search warrant affidavit. These new allegations comprised permit and other violations of the Resource Conservation and Recovery Act of 1976 ("RCRA"), Pub.L. No. 94–580, 90 Stat. 2795 and the Clean Water Act of 1997, Pub.L. No. 95–217, 91 Stat. 1566 ("CWA"). Rockwell continued to employ counsel for itself and its employees to respond to these charges and used the database in its defense.

Beginning in early 1991, negotiations between Rockwell and the government were conducted concerning a plea agreement. The terms of the negotiated settlement were memorialized in a "Plea Agreement" dated March 26, 1992 ("the Agreement"). In the Agreement, Rockwell pled guilty to four felony violations of RCRA and one

---

**1.** The basic contract provisions pertinent to this appeal remained unchanged during the relevant period. References in this opinion are made to the language of modification M087 as representative of the contract language during that period.

felony and five misdemeanor violations under the CWA in exchange for a release for itself and its employees. "None of the ten counts agreed to in the Plea Agreement (the Charged Conduct) w[as] based upon the allegations in the search-warrant affidavit (the Uncharged Conduct)." *Id.* at *26. An \$18.5 million fine was levied against Rockwell, for which Rockwell agreed not to seek reimbursement from the government. Rockwell also agreed not to seek reimbursement of attorneys' fees and costs incurred by Rockwell in defending or preparing to defend against the charges to which Rockwell pled guilty (the Charged Conduct). It was agreed that Rockwell would be permitted to seek recovery of its costs related to investigation of criminal conduct that never ripened into criminal charges (the Uncharged Conduct):

> Both parties recognized that it would be administratively difficult to segregate the corporation's defense costs for Charged versus Uncharged Conduct. *At the same time, they understood that the early stages of the investigation related almost exclusively to Uncharged Conduct found in the search-warrant affidavit.* Rockwell, therefore, proposed a bright-line date of May 1, 1990, for dividing Charged from Uncharged Conduct. *After further negotiations, the parties agreed to move the bright-line date back to January 1, 1990. Costs incurred for defending the corporation prior to that date would be deemed related to Uncharged Conduct, and costs after that date would be deemed related to Charged Conduct. Rockwell would be free to seek costs incurred in defending the corporation for Uncharged Conduct, but not seek such costs for Charged Conduct.* In this way, the parties would achieve an administratively simple means of preserving DOJ's condition that Rockwell would not seek reimburse-

ment for defending the corporation against Charged Conduct.

*Id.* at *21–22 (emphases added). In accordance with the negotiated agreement on Uncharged Conduct, the Agreement provided that:

> As authorized by 41 U.S.C. § 256(c) (the Major Frauds Act) and 10 C.F.R. § 970.3102–20(c), Rockwell may seek to recover from DOE (and subject to DOE's review and approval in accordance with the relevant contract(s) and applicable law and regulations): (a) attorneys fees and costs incurred by Rockwell (on behalf of the corporation) prior to January 1, 1990 (but not thereafter); (b) attorneys, fees and costs incurred by Rockwell in providing legal representation to past and present Rockwell employees; and (c) costs concerning a computer system which is also used in Rocky Flats-related civil litigation.

*Id.* at *25. The settlement agreement also stated that "nothing in this agreement shall be construed as an admission by Rockwell, or a determination by the Department of Justice, of 'willful misconduct or lack of good faith' by Rockwell's managerial personnel." *Id.*

After the settlement, Rockwell submitted three vouchers to the contracting officer seeking reimbursement of costs related to the investigation of Uncharged Conduct. The government refused to reimburse these costs. On June 22, 1995, Rockwell submitted a written claim for reimbursement to the contracting officer, to which no response was sent. The claim was therefore deemed to be denied pursuant to 41 U.S.C. § 605(c)(5). *Id.* at *52.

Following the deemed denial of its claim, Rockwell brought an action before the Board under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–13. *Id.* The Board held that the Major Frauds Act, 41 U.S.C. § 256, was not a bar to recovery. *Id.* at

*53. The Board also found that the costs for which Rockwell sought reimbursement were stipulated by the parties as " 'belong[ing] to the three categories of costs identified' in the plea Agreement." *Id.*

The Board then proceeded to analyze the disputed costs in relation to the terms of the M & O contract. The Board initially addressed the corporate defense costs. The contracts during the period in question included 16 categories of allowable costs and 21 categories of unallowable costs. The Board first looked to clause (c) of the contract ("the General Allowability Clause"), which provides:

> The allowable cost of performing the work under the contract shall be the costs and expenses that are actually incurred by the Contractor in the performance of the contract work in accordance with its terms, that are necessary or incident thereto, and are determined to be allowable pursuant to this paragraph (c). The determination of the allowability of cost hereunder shall be based on: (1) reasonableness, including the exercise of prudent business judgment; (2) consistent application of generally accepted accounting principles and practices that result in equitable charges to the contract work; and (3) recognition of all exclusions and limitations set forth in this clause or elsewhere in this contract as to types or amounts of items of cost.

*Id.* at *9. The Board found that the costs were allowable thereunder, because "the defense costs incurred in defending against the allegations contained in the search warrant were costs incurred within the scope of the Contracts and were neces-sary and incident thereto." *Id.* at *61–62. The Board found that it was undisputed that the costs were reasonable as required under the General Allowability Clause.

The Board also found that the corporation's defense costs were allowable under clause (d)(16) of the contract ("the Environmental Costs Clause"), which is a specifically negotiated provision allowing for the reimbursement of environment costs. The Environmental Costs Clause makes allowable:

> *All costs incurred by the Contractor with respect to any and all liabilities, claims, demands, damage costs, or penalties (such as civil sanctions including fines), arising out of, or related to environmental, safety and health activities, including costs incurred with respect to investigation,* removal, remedial action, ground and surface water or other clean-up of hazardous, toxic or contaminated material(s), except for those costs that result from conduct identified in subparagraph (e)(17)(ii) of the clause entitled, "Allowable Costs, Base Fee and Award Fee."

*Rockwell,* 2001 WL 1543836, 2001 EBCA LEXIS 7, at *11 (emphasis added). Subparagraph (e)(17)(ii) expressly excludes costs that "result from willful misconduct or lack of good faith on the part of any of the Contractor's managerial personnel." [2] *Id.* at *12. The Board interpreted this clause as "broad in scope and reflect[ing] the intent that Rockwell be reimbursed to the maximum extent possible for costs incurred in the performance of contract work related to environmental, health and safety activities." *Id.* at *63. The Board found that "[its] expansive interpretation

---

2. As discussed above, the settlement agreement provided that there was no "admission by Rockwell, or ... determination by the Department of Justice, of 'willful misconduct or lack of good faith' by Rockwell's managerial personnel." *Rockwell,* 2001 EBCA LEXIS 7, at *25. There is no claim here that any of the charges resulted from willful misconduct or lack of good faith by managerial personnel.

comports with other evidence showing that this kind of coverage has long been DOE's practice and policy under M & O contracts." *Id.* at *64.

The definition of the contested costs as "allowable" under the contract, however, is subject to express contractual exclusions. The Board, therefore, proceeded to review the relevant exclusions provided in clause (e)(12) ("the Fines and Penalties Clause") and clause (e)(16) ("the Contesting Actions Clause"). The Fines and Penalties Clause excludes from allowable costs:

> Fines and penalties, including assessed interest, resulting from violations of, or failure of, the Contractor to comply with Federal, state, local or foreign laws or regulations, except when incurred as a result of compliance with the scope of work, specific terms and conditions, or other provisions of the contract or written instructions from the Contracting Officer authorizing in advance such payments.

*Id.* at *12. The Board interpreted this clause as not applying where "th[e] fines and penalties were incurred by the contractor because it was performing work contracted for by DOE." *Id.* at *65. Thus, fines and penalties would not be unallowable if the "work required or authorized under the contract violate[d] a particular law." *Id.* In addition to fines and penalties, the Board concluded that defending against reimbursable fines and penalties should also be reimbursable "since it would make little sense to reimburse contractors under the Fines and Penalties Clause for fines and penalties incurred because of the performance of contract work and at the same time not allow the contractor the costs of defending against the imposition of those same fines or penalties." *Id.* at *69. The Board also found that Rockwell did not waive its right to claim the costs by failing to provide written notice to, and obtain approval from, the contracting officer before incurring the costs. *Id.* at *78–79.

The Board rejected the government's contention that the "Contesting Actions Clause" barred recovery of the corporation's defense costs. That clause excludes the cost of "[l]egal, accounting, and consulting services and related costs incurred in connection with . . . contesting actions of [sic, or] proposed actions of the United States." *Id.* at *70.[3] The government urged that this clause takes priority over the allowance provisions, thus barring recovery. The Board concluded that the government's interpretation was inconsistent with the government's prior practice and in conflict with the Environmental Cost and Fines and Penalties Clauses. *Id.* at *75–76. Based on its findings, the Board concluded that Rockwell was entitled to reimbursement for its corporate defense costs from June 6, 1989, to December 31, 1989.

With regard to the employee defense costs, the Board found that even though no indictments were ever brought against the individual employees, Rockwell was required under Delaware corporation law to provide independent counsel to employees subject to potential civil and criminal charges. *Id.* at *85 (citing Del.Code. Ann. tit. 8, § 145(c) (1989)). The M & O contracts provide for allowability of employee

---

**3.** The Contesting Actions Clause provides in full:

> Legal, accounting, and consulting services and related costs incurred in connection with the preparation and issuance of stock rights, organization or reorganization, pros-

ecution or defense of antitrust suits, prosecution of claims against the United States, contesting actions of [sic] proposed actions of the United States, and prosecution or defense of patent infringement litigation. *Rockwell,* 2001 EBCA LEXIS 7, at *11–12.

defense costs in the "Employee Defense Provision." [4] The Board interpreted the investigation as a "legal action" within the meaning of the clause, thus rendering the costs allowable. *Id.* at *88–89. As with the corporate defense costs, the Board held that the Contesting Actions Clause did not bar the employee defense costs. The Board also held that Rockwell did not waive its right to reimbursement for the employee defense costs by failure to meet the notice and approval requirement of the Employee Defense Provision and the Contesting Actions Clause. *Id.* at *93–94.

With respect to the database costs, the Board first held "the costs needed to create, update and maintain the database prior to January 1, 1990, [were] allowable for the same reasons" that the corporate defense costs for that period were allowable. *Id.* at *99. As to the costs incurred on or after January 1, 1990, the Board held:

In order for the database creation and maintenance costs to be barred by the Plea Agreement, we must find that these costs were incurred after December 31, 1989 *and were incurred defending the corporation in the criminal investigation, and for no other purpose. If these costs were incurred for multiple purposes, some of which alone would make the costs allowable, then the costs are still allowable regardless of the Plea Agreement.*

*Id.* at *101 (emphasis added). Because it found no evidence of costs related solely to

the Charged Conduct "and for no other purpose," the Board held that all of the costs were allowable.

The government timely appealed the Board's decision.

## DISCUSSION

### I

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(b) and 41 U.S.C. § 607(g)(1)(B). The standard of review applied to Board decisions is prescribed by statute:

[T]he decision of the agency board on any question of law shall not be final or conclusive, but the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.

41 U.S.C. § 609(b) (2000).

At the outset we note that this case does not require us to determine the effect of the Major Frauds Act of 1988, 41 U.S.C. § 256, and its implementing regulations on the contract in question here. That Act provides in relevant part that costs incurred in connection with a criminal proceeding by the United States that is disposed of by consent or compromise are not

---

**4.** The Employee Defense Provision provides:
 1. If a claim or legal action is brought against an employee as the result of the employee's conduct *when performing duties under this contract and within the employee's scope of employment the contractor shall be allowed the cost of defending the employee* ...; provided, however, that the prior approval of the Contracting Officer and the consent of the employee to be defended shall be obtained before such defense is undertaken.

 2. The provisions of the contract clause entitled, "Litigation and Claims" shall *have the same application to claims and legal actions against employees under this section as it has to those claims and legal actions which are brought directly against the Contractor.* Before costs of any retained legal counsel may be allowed, the selection of such counsel must have the concurrence of the Contracting Officer.
*Rockwell,* 2001 EBCA LEXIS 7, at *87–88 (emphases added).

allowable, except that the costs "may be allowed to the extent specifically provided in such [consent or compromise] agreement." 41 U.S.C. § 256(k)(3) (2000). The Board held that, under the plea agreement, the government waived application of the Major Frauds Act in accordance with § 256(k)(3). The government has not appealed that determination. Accordingly the Major Frauds Act cannot be a ground for disallowing the costs in question.

## II

■ The dispute here is whether costs incurred defending against Federal environmental allegations, which never ripened into charges, are included as allowable costs under the allowability provisions of the M & O contract and/or are excluded as unallowable under the exclusions in the M & O contract. The first contract provision cited by the Board as providing for the allowability of Rockwell's defense costs was the General Allowability Clause. That clause (quoted above) broadly provides for the allowability of the costs and expenses of work under the contract "that are necessary or incident thereto." *Rockwell*, 2001 EBCA LEXIS 7, at *9. There is little dispute that the sweeping language of the General Allowability Clause embraces the costs claimed here. However, that is not dispositive. The government correctly points out that the General Allowability Clause is subject to the express disallowance provisions of the contract. Subsection (c) of the contract provides that "allowable cost[s] shall not include the cost of

any item described as unallowable in paragraph (e) of this clause except as indicated therein." *Id.* In particular, the Contesting Actions Clause (clause (e)(16)) provides that "[l]egal, accounting, and consulting services and related costs incurred in connection with . . . contesting actions of [sic, or] proposed actions of the United States" are not allowable. *Id.* at *11–12. The Contesting Actions Clause reflects a long-standing policy of the United States disallowing such costs. *See generally Bill Strong Enters. Inc. v. Shannon*, 49 F.3d 1541, 1546–47 (Fed.Cir.1995), *overruled on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1579 (Fed.Cir.1995) (en banc). This policy was applied to the Department of Energy by the following regulatory provision, which excluded:

> Legal, accounting, and consulting services and related costs incurred in connection with the preparation and issuance of stock, rights, organization or reorganization, prosecution or defense of antitrust suits, prosecution of claims against the United States, contesting actions of proposed actions of the United States, and prosecution or defense of patent infringement litigation.

48 C.F.R. § 970.5204–13(e)(16) (1988).[5]

■ The parties appear to agree that the literal scope of the Contesting Actions Clause disallows Rockwell's costs incurred to defend against the criminal action contemplated in the search warrant. As found by the Board, "[t]he parties do not dispute that the investigation and the Grand Jury proceedings were actions of

---

**5.** A similar but differently worded regulation was provided in the general FAR provisions as follows:

> Costs of legal, accounting, and consultant services and directly associated costs incurred in connection with organization and reorganization (also see 31.205–27), defense of antitrust suits, *defense against Government claims or appeals,* or the prosecution

of claims or appeals against the Government (see 33.201) are unallowable (but see 31.205–47).

48 C.F.R. § 31.205–33(d) (1988) (emphasis added). Thus, the general FAR provision referred only to defense against government claims or appeals, whereas the Department of Energy provision further included "proposed actions" by the United States in its exclusion.

the United States." *Rockwell,* 2001 EBCA LEXIS 7, at *60 n. 16. Under general rules of contract law we are to interpret provisions of a contract so as to make them consistent. *Lockheed Martin IR Imaging Sys. Inc. v. West,* 108 F.3d 319, 322 (Fed.Cir.1997). Here, it is entirely consistent to interpret the broad language of the General Allowability Clause as being subject to the exclusion under the Contesting Actions Clause. The General Allowability Clause, therefore, does not itself support the allowability of Rockwell's defense costs.

### III

The second contract clause cited by the Board in support of its finding of allowability was the Fines and Penalties Clause. That clause provides:

> Fines and penalties, including assessed interest, resulting from violations of, or failure of, the Contractor to comply with Federal, state, or local laws or regulations, [are unallowable] except when incurred in accordance with the written approval of the Contracting Officer or *as a result of compliance with the provisions of this contract.*

*Rockwell,* 2001 EBCA LEXIS 7, at *11 (emphasis added).

The Board interpreted the language of the clause in two parts, 1) as an express allowance of fines and penalties "where those fines and penalties were incurred by the contractor because it was *performing work contracted for by DOE,*" *id.* at *64–65 (emphasis added), and 2) as an implicit allowance of the costs of defending against the imposition of those same fines or penalties, *id.* at *69. The Board reasoned that, since fines and penalties (and associated legal fees) for the Uncharged Conduct would have been recoverable if fines or penalties had been imposed, then legal fees related to Uncharged Conduct would

have been allowable under this clause even though no fines or penalties were actually imposed. *Id.*

It is questionable whether this clause should be construed to authorize the reimbursement of all fines and penalties attributable to work within the scope of the contracts. There is a strong public policy barring recovery of criminal fines and penalties, *see Tank Truck Rentals, Inc. v. Comm'r,* 356 U.S. 30, 35–36, 78 S.Ct. 507, 2 L.Ed.2d 562 (1958) (barring the deductibility of fines in the context of tax law); *McBrearty v. United States Taxpayers Union,* 668 F.2d 450, 451 (8th Cir.1982). This strong public policy is reflected in a statutory provision adopted in 1985 (before the execution of the first contract in question here). That statute provided:

> The following costs are not allowable .... Payments of fines and penalties resulting from violations of, or failure to comply with, Federal, State, local, or foreign laws and regulations, except when incurred as a result of *compliance with specific terms and conditions of the contract* or specific written instructions from the contracting officer authorizing in advance such payments in accordance with applicable regulations of the Secretary of Energy.

Department of Defense Authorization Act, 1986, Pub.L. No. 99–145, 99 Stat. 583, 774 (emphases added). The statute does not provide for a broad "scope of work" exception, but rather narrowly refers to "compliance with specific terms and conditions of the contract." *Id.* This suggests that the provision is applicable only to fines and penalties that resulted from particular work directly required by the contract. For example, if the contract ordered that a particular area be filled, a fine incurred for doing that very act in the manner required by the contract would be recoverable. If, however, the work could have reasonably

been performed so as to avoid the levied fines or penalties, there would be no reimbursement under the exception to the general non-allowability language of the Fines and Penalties Clause. A broader "scope of work" interpretation would appear to render virtually all fines and penalties allowable.

The view that this exception is of limited scope is supported also by the Department of Defense Authorization Act, which included an identical limitation on allowability under Department of Defense (DOD) contracts, *id.*, 99 Stat. at 682, and imposed fines and penalties for violations of specific provisions of the act. For example, a $10,000 penalty is imposed for failure to comply with reporting requirements placed on former employees of DOD. *Id.*, 99 Stat. at 695. Similarly, a $500,000 fine is imposed under the Act on contractors who knowingly employ a person convicted of a defense-contract-related felony. *Id.*, 99 Stat. at 669. Under the Board's interpretation these fines and penalties would be reimbursable because the costs were "incurred because of the performance of contract work," *Rockwell*, 2001 EBCA LEXIS 7, at *69, a result that appears to be inconsistent with the congressional purpose to require that the contractor bear the costs of these fines and penalties. Finally, the Fines and Penalties Clause, unlike the Environmental Costs Clause, does not exclude costs incurred that are unallowable under clause (e)(17)(ii), which relates to willful misconduct and lack of good faith by managerial personnel. Thus, the "performance of contract work" exception as interpreted by the Board would apparently permit the reimbursement of criminal fines incurred pursuant to the performance of any contract work, even if the result of willful misconduct or lack of good faith on the part of managerial personnel. This dubious result further indicates that it is unlikely that the Fines and Penalties Clause should be given the broad scope suggested by the Board, despite the fact that the Department of Energy had previously paid civil fines and penalties under the contract and interpreted the Fines and Penalties Clause broadly. *See id.* at *43–46.

However, we need not decide whether the Fines and Penalties Clause includes the broad scope of work exception relied upon by the Board, since we conclude that another contract clause (the Environmental Costs Clause) renders the costs allowable without regard to the Fines and Penalties Clause.

### IV

 The final contract clause cited by the Board in support of its holding of allowability as to Rockwell's defense costs was the Environmental Costs Clause. This clause provides for the allowability of:

> All costs incurred by the Contractor with respect to any and all liabilities, claims, demands, damage costs, or penalties (such as civil sanctions including fines), arising out of, or related to environmental, safety and health activities, including costs incurred with respect to investigation, removal, remedial action, ground and surface water or other clean-up of hazardous, toxic or contaminated material(s).

*Id.* at *11. There is little dispute that the language of the clause covers Rockwell's costs incurred to defend itself and its employees against the environmental investigation. The clause refers to *"[a]ll costs . . . with respect to any and all . . . penalties (such as civil sanctions including fines), arising out of, or related to environmental . . . activities." Id.* (emphasis added). Further, it expressly refers to the costs incurred "with respect to investigation." Tellingly, the clause specifically excludes

"costs that result from conduct identified in subparagraph (e)(17)(ii)." *Id.* That subparagraph refers to costs that "result from willful misconduct or lack of good faith on the part of any of the Contractor's managerial personnel." *Id.* at *12. The limited nature of this exclusion suggests a broad scope of coverage where, as here, there is no claim of willful misconduct or lack of good faith by managerial personnel. This language clearly covers the costs incurred with respect to EPA investigations under the circumstances of this case. The government apparently concedes that the Environmental Costs Clause embraces the costs for which Rockwell seeks reimbursement, stating that: "subparagraph 54(d)(16) appears ... to imply that Rockwell may recover for these sorts of expenses." (Appellant's Br. at 14.)

■ The government's central argument is that, even if Rockwell's defense costs fall within the scope of allowable costs under the Environmental Costs Clause, those costs are rendered expressly unallowable under the Contesting Actions Clause. *Id.* at 11. As noted above, that clause provides that costs associated with "contesting actions [or] proposed actions of the United States" are not allowable. *Rockwell,* 2001 EBCA LEXIS 7, at *11–12.

■ According to the government, "the contract contains an internal 'order of precedence' in which the *exclusions* from costs described in paragraph 54(e) take precedence over the *inclusions* reflected in paragraphs 54(c) and 54(d)." (Appellant's Br. at 12.)[6] The language upon which the government relies provides: "[a]llowable cost shall not include the cost

of any item described as unallowable in paragraph (e) of this clause except as indicated therein." *Rockwell,* 2001 EBCA LEXIS 7, at *9. The government's approach would make sense if the result were to partially limit the coverage of the Environmental Costs Clause. But that is not the effect of the government's interpretation. Rather, the effect of that interpretation is effectively to rewrite the clause so that it is entirely inapplicable to all proceedings brought under the federal environmental laws, an area that the clause was explicitly drafted to cover. *Id.* at *47–48. Although in general a contract should be interpreted so as to avoid conflict in its provisions, *see Air–Sea Forwarders, Inc. v. United States,* 166 F.3d 1170, 1172 (Fed.Cir.1999); *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed.Cir.1983), there is a clear conflict between a clause that expressly provides for the reimbursement of specific costs (the Environmental Costs Clause) and another clause (the Contesting Actions Clause) that purportedly requires the opposite result. The government, in fact, concedes that "[v]iewed in isolation, subparagraph 54(d)(16) [the Environmental Costs Clause] appears to conflict with the Contesting Actions [Clause]." (Appellant's Br. at 14.) However, the government suggests that the conflict between the two clauses can be avoided by interpreting the Environmental Costs Clause as allowing recovery of fines and penalties where there was no conflict of interest between the contractor and the government. *Id.* at 8. There is no basis for this interpretation of the contract. The gov-

---

**6.** In its reply brief, the government refers to a standard contract clause called an "Order of Precedence Clause," which it admits is not present in the contracts at issue here. (Appellant's Reply Br. at 9 n. 5.) Such clauses have been cited by this court to resolve conflicts between contract specifications and drawings,

such that if "the contract contains an order of precedence clause, the specifications shall control [over the drawings]." *Hensel Phelps Constr. Co. v. United States,* 886 F.2d 1296, 1298 (Fed.Cir.1989); *see also Government Contracts: Cyrcolopedic Guide to Law, Administration, Procedure* § 2.180 (2000).

ernment also argues that the conflict may be avoided by interpreting the Environmental Costs Clause as not applying to criminal proceedings. *Id.* at 14–15. The Contesting Actions Clause, however, is also not limited to criminal proceedings. The government's distinction based on criminal proceedings, therefore, does not avoid a conflict between the two clauses. We must, therefore, determine which of the conflicting terms controls.

■ When construing a contract containing conflicting terms, general rules of interpretation apply. Under these rules, "[w]here specific and general terms in a contract are in conflict, *those which relate to a particular matter control over the more general language.*" *Hills Materials Co. v. Rice,* 982 F.2d 514, 517 (Fed.Cir. 1992) (emphasis added); *Goldwasser v. United States,* 163 Ct.Cl. 450, 325 F.2d 722, 723 (1963); *see also Restatement (Second) of Contracts* § 203(c) (1981) ("[S]pecific terms and exact terms are given greater weight than general language."); *Farnsworth on Contracts* § 7.11 (2d ed. 2000) ("If, however, two provisions in a contract so clearly conflict that both cannot be given full effect, it is assumed that the more specific the provision, the more likely it is to reflect the parties' intention."). The language of the Environmental Costs Clause is particularly directed toward providing for the allowability of the very category of costs at issue here. The Contesting Actions Clause, which also refers to excluding the costs of "the preparation and issuance of stock rights, organization, or reorganization, prosecution or defense of antitrust suits . . . and prosecution or defense of patent infringement litigation," *Rockwell,* 2001 EBCA LEXIS 7, at *11–12, is a more general exclusionary clause.

■ It is also a rule of contract interpretation that "separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated." *Restatement (Second) of Contracts* 203(d) (1981). Here, as found by the Board, Rockwell specifically negotiated the inclusion of the Environmental Costs Clause. *Rockwell,* 2001 EBCA LEXIS 7, at *47. The government does not dispute this fact. (Appellant's Reply Br. at 22.) Finally, it is a general rule of contract interpretation that terms of a contract should not be interpreted so as to render them ineffective or superfluous. *Lockheed Martin,* 108 F.3d at 322; *see also Restatement (Second) of Contracts* § 203(a) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect"). The government's interpretation would largely eviscerate the portion of the Environmental Costs Clause allowing defense costs for proceedings seeking environmental penalties. A contrary interpretation, however, allows a broad scope of the Contesting Actions Clause outside of environmental, safety, and health related activities. Under the rules of contract interpretation, therefore, the Environmental Costs Clause must prevail. We thus hold that the legal fees in defense against Uncharged Conduct are recoverable because they are within the scope of allowable costs under the Environmental Costs Clause.

## V

As to Rockwell's costs associated with defending individual employees, the government does not argue that the substantive allowability of those costs should be treated differently from Rockwell's corporate defense costs. (Appellant's Br. at 27–28.) Thus, the employee defense costs are substantively allowable for the same reasons as applied to the corporate defense costs.

■ However, the government argues in the alternative that the employee defense costs are unallowable for failure to receive prior approval of the Contracting Officer. *Id.* The contract provided that the costs "shall be allowed ... provided, however, that the prior approval of the Contracting Officer ... shall be obtained." *Rockwell,* 2001 EBCA LEXIS 7, at *13. The government urges that Rockwell sought the Contracting Officer's approval to incur these costs, but that the Contracting Officer reasonably denied those costs. (Appellant's Br. at 27–28.) The Board held, however, that the denial was unreasonable. *Rockwell,* 2001 EBCA LEXIS 7, at *93. Because the employee defense costs were substantively allowable, we agree with the Board that it was unreasonable for the Contracting Officer to deny approval to incur those costs, and that therefore, the employee defense costs are allowable under the contract.

## VI

■ Finally, we consider the third category of costs (the database costs), which costs were attributable to the unsuccessful criminal environmental defense (a cost which may be unallowable) as well as successful criminal environmental defense and other non-criminal uses (which are allowable). Normally the costs of a database used for more than one purpose should have been apportioned in some manner to reflect both the allowable and unallowable uses. Here, however, the government did not argue for the apportionment of those costs, but rather followed an all or nothing approach, arguing only that these costs be found unallowable in their entirety for the same reasons that it urged that the corpo-

rate defense costs were unallowable. (Appellant's Br. at 28–29.) Having found that the corporate defense costs are allowable, the database costs are similarly allowable because the government has waived its right to argue for apportionment.[7]

## CONCLUSION

For these reasons we hold that Rockwell incurred reimbursable costs when defending itself against allegations of environmental violations that never ripened into criminal charges (the Uncharged Conduct). The allowable costs include its corporate defense costs, its employee defense costs, and the costs of the database. Accordingly, the decision of the Board is affirmed.

*AFFIRMED.*

## COSTS

No costs.

---

7. Thus, in view of our disposition of this case, we need not address and do not address any potential conflict between the Environmental Costs Clause and the Fines and Penalties Clause with respect to the allowability of actual criminal environmental fines imposed and associated defense costs (*i.e.,* the costs of an unsuccessful criminal defense).